UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STACY SHAVONNE HOPKINS,                          :

               Plaintiff,          :          13 Civ. 4803 (AT) (AJP)

        -against-                            :          **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, Commissioner of Social          :
Security,
                              :
              Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Analisa Torres, United States District Judge:**

        Plaintiff Stacy Shavonne Hopkins brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security (the "Commissioner") denying her Supplemental Security Income ("SSI") benefits. (Dkt.

No. 2: Compl.) Presently before the Court are the parties' cross-motions for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 12: Hopkins Notice of Motion; Dkt. No. 20:

Comm'r Notice of Motion.)

        For the reasons set forth below, the Commissioner's motion (Dkt. No. 20) should be

GRANTED and Hopkins' motion (Dkt. No. 12) should be DENIED.

## FACTS

**Procedural Background**

        On July 19, 2010, Hopkins applied for SSI benefits, alleging that she was disabled

since January 1, 2007. (Dkt. No. 11: Administrative Record filed by the Comm'r ("R.") 46, 118.)

Hopkins alleged disability due to pinched nerves, muscle spasms, inflammation of her right knee,

lower back pain, anemia, heart burn, a thyroid condition and uterine fibroids.  (R. 28, 116, 118.)  The Social Security Administration ("SSA") found that Hopkins was not disabled, and denied the application.  (R. 47-51.)  Hopkins requested an administrative hearing.  (R. 53.)

Administrative Law Judge ("ALJ") Mark Hecht conducted a hearing on September 6, 2011, at which Hopkins appeared with her current counsel.  (R. 22-45.)  On November 4, 2011, ALJ Hecht issued a written decision finding Hopkins not disabled.  (R. 8-18.)  ALJ Hecht's decision became the Commissioner's final decision when the Appeals Council denied Hopkins' request for review on May 10, 2013.  (R. 1-3.)

The issue before the Court is whether the Commissioner's decision that Hopkins is not disabled is supported by substantial evidence.

**Non-Medical Evidence**

Hopkins, born on February 14, 1973, was thirty-three years old at the alleged January 1, 2007 onset of her disability, thirty-seven when she filed her application on July 19, 2010, and thirty-eight on the date of her September 6, 2011 hearing.  (R. 25, 46.)  Hopkins graduated from college with a bachelor's degree in social science in 2009.  (R. 26, 119.)  In March 2011, Hopkins began an online education program toward a master's degree in human behavior.  (R. 37.)  At the hearing, Hopkins reported she was doing well in those courses.  (R. 38.)

From 1999 to 2000, Hopkins worked as a bank data processor.  (R. 26, 112.)  This job required her to sit and type for eight hours each day, and did not require her to lift any weight. (R. 112.)  From 2001 to 2004 Hopkins worked as a New York City Parks Department after-school program assistant.  (R. 26, 111.)  This job required her to walk for four hours, stand for four hours and kneel for three hours each day, and frequently required her to lift less than ten pounds.  (R. 111.) From 2005 to 2007 Hopkins was self-employed "off and on" braiding hair.  (R. 27, 110.)  This job

required her to stand for seven hours, sit for four hours, and write, type or handle small objects for one hour each day, and did not require her to lift any weight.  (R. 110.)

Hopkins lives in an apartment with her boyfriend and three children, ages seventeen (twins) and twelve.  (R. 37, 42, 101.)  Hopkins bathes and dresses herself, and performs light household chores such as making beds, sweeping floors and ironing.  (R. 42-43, 101-03.)  Hopkins cooks for herself and her children but her boyfriend assists when meals require long preparation times.  (R. 42, 103, 107.)  Her boyfriend also assists with mopping and other household chores.  (R. 42, 103.) Hopkins shops for groceries and clothing for one hour each month but needs assistance.  (R. 43, 104.)  Hopkins goes outside one or two times per day; she rides in a car but does not drive and does not have a driver's license.  (R. 104.)  Hopkins watches television, reads, listens to music and talks to family and friends on the telephone daily.  (R. 105.)  She works on her master's degree online daily, but often lies down and needs her daughter's assistance typing.  (R.  37-38, 40.) Hopkins goes to church five times a month and physical therapy twice a week.  (R. 101, 105.)

Since 2008, Hopkins has experienced lower back pain that does not travel to her legs or other extremities.  (R. 28-29, 32.)  Hopkins fell down the stairs in 2008 and has experienced "excruciating" knee pain in both knees since 2009.  (R. 32-34.)  She takes Gabapentin for her back and knee pain in the evenings but stated that she cannot take it during the day because it causes drowsiness.  (R. 35, 40-41.)  Hopkins testified that she could not stand or walk for one or two hours during an eight-hour day because she would experience "excruciating pain" in her knees and back.  (R. 42.)  She testified that she could sit for five to ten minutes before her "knees start locking up," stand for "a few minutes" before her "legs start to wobble," and "carry no more than five pounds" before her "back start[s] hurting."  (R. 35-36.)  Hopkins stated that she can walk for half a block before needing to rest for ten minutes.  (R. 36, 107.)  She testified that she never used a cane or any

other assistive device.  (R. 36.)  In her application, Hopkins indicated she needs a knee brace to walk long distances "and for walking around."  (R. 107.)  She also indicated in her application that standing, walking, sitting, climbing stairs, kneeling and squatting cause knee, leg and/or back pain, tightness or weakness, and that reaching hurts her arms and causes them to "lock[] up," but that she can use her hands.  (R. 106.)

**Medical Evidence Before the ALJ**

    **Prior to July 19, 2010**

        **Dr. Martin Luther King Jr. Health Center**

            **2004 - 2007**

Hopkins was treated at the Dr. Martin Luther King Jr. Health Center ("MLKHC") beginning in 2004.  (R. 136-303.)  Treatment notes dated June 3, 2004 list back pain, chronic cigarette smoking and hypertension among Hopkins' "active/chronic problems."  (R. 262.)  On August 18, 2004, Hopkins weighed 230.5 pounds and presented with hypertension and complaints of back pain for the past one to two days.  (R. 258-59.)  On October 15, 2004, Hopkins reported that she had not taken her hypertension medication for two days and treatment notes indicate noncompliance with prescribed medication.  (R. 252.)  On October 29, 2004, November 4, 2004, November 12, 2004, January 31, 2005, March 31, 2005 and May 6, 2005, Hopkins' weight was recorded between 218 and 223 pounds.  (R. 236, 242, 244, 246, 248, 250.)  On May 13, 2005, Hopkins weighed 220 pounds and presented with hypertension.  (R. 232-33.)  Treatment notes indicate her hypertension was "well cont[rolled] with medication."  (R. 233.)  On June 24, 2005, Hopkins weighed 218 pounds and presented with hypertension.  (R. 230.)  She was advised to quit smoking and seek weight loss counseling.  (R. 231.)

Treatment notes dated July 28, 2006 show a history of hypertension and that Hopkins "was last seen in the clinic a year ago, and has been non compliant [with] meds," noting she last took her medication three months ago. (R. 211.) On August 8, 2006, Hopkins weighed 221 pounds and presented with hypertension. (R. 209.) Treatment notes dated July 31, 2007 state that Hopkins has a history of hypertension and "does not seem compliant with medical Rx." (R. 205.) On August 7, 2007, Hopkins weighed 232.5 pounds and presented with hypertension and anemia. (R. 203.)

### 2008

On March 14, 2008, Hopkins weighed 246 pounds and presented with hypertension. (R. 199.) Hopkins reported that she was "still smoking but less [number] of cigs," and treatment notes indicate "smoking cessation," "weight loss" and "low salt diet" were recommended, and she was advised to "take BP meds." (R. 199-200.) On June 17, 2008, Hopkins weighed 243 pounds, reported smoking cigarettes and presented with hypertension. (R. 195.) On July 1, 2008, Hopkins weighed 240 pounds, reported smoking seven cigarettes per day, and treatment notes state: "HTN on meds., didn't take meds today." (R. 191-92.) On July 22, 2008, Hopkins weighed 241 pounds, reported smoking cigarettes, and treatment notes state: "Pt did not take her HTN med today, agrees to go now to pharmacy to fill Rx [and] take today. Encouraged to take all prescribed meds as directed and to come . . . if any issues [with] refills, etc." (R. 189.) On December 29, 2008, Hopkins weighed 235.3 pounds with a body mass index ("BMI") of thirty-five and reported smoking seven to eight cigarettes per day. (R. 187.) Her hypertension was "uncontroll[ed]" and treatment notes indicated she was "non adherent to med[ications]." (R. 187-88.)

### 2009

On January 5, 2009, Hopkins weighed 231 pounds with a BMI of 33.9 and reported smoking cigarettes. (R. 185.) On January 14, 2009, Hopkins weighed 235.2 pounds. (R. 183.) On

April 6, 2009, Hopkins weighed 235 pounds with a BMI of thirty-five and presented with hypertension, which was "stable." (R. 179.) She reported that she was smoking cigarettes and was "doing well." (R. 179.) Treatment notes also indicate a thyroid goiter and anemia, and that Hopkins was "not taking [illegible] tabs." (R. 179.) On April 9, 2009, Hopkins weighed 233 pounds with a BMI of thirty-five. (R. 177.) On April 14, 2009, an ultrasound of Hopkins' pelvis revealed uterine fibroids. (R. 176.) On May 6, 2009, Hopkins weighed 231 pounds. (R. 174.) On May 19, 2009, Hopkins weighed 235 pounds with a BMI of 36 and reported smoking seven cigarettes per day. (R. 171.) Treatment notes indicate "smoking cessation" and "low salt diet / exercise / w[eigh]t loss" were recommended. (R. 171.) On June 10, 2009, Hopkins weighed 236 pounds, her hypertension and anemia were "improved" and her thyroid goiter was "nonharm-active." (R. 169.)

On August 12, 2009, Hopkins weighed 240 pounds and reported smoking seven cigarettes per day. (R. 167.) Treatment notes indicate her hypertension was "uncontrolled" and she "ha[d] not taken [her] BP med [in] 2 wks." (R. 167.) "[L]ow salt diet / exercise," "smoking cessation" and "w[eigh]t loss" were recommended, and it was noted that Hopkins was "interested in bariatric [weight loss] surgery." (R. 167.) On September 16, 2009, Hopkins weighed 235 pounds and reported smoking three cigarettes per day. (R. 165.) Her hypertension was "controlled," her anemia was "improved," and her thyroid goiter was not active. (R. 165.) Treatment notes state she was "taking BP medx daily – trying to lose weight – saw nutritionist – did not go to bariatric surg[ery] seminar." (R. 165.) On September 28, 2009, Hopkins was seen for nutritional counseling including "weight monitor" and "dietary intake assessment." (R. 157.) Hopkins weighed 235 pounds with a BMI of thirty-three. (R. 157.) Treatment notes state: "Reinforcement of nutrition education provided for healthy choices, healthy eating, exercise and smoking cut down. This is to help for target weight loss to achieve optimal healthy outcome." (R. 157-58.)

On November 4, 2009, Hopkins weighed 238 pounds with a BMI of thirty-four.  (R. 158, 163.)  Records show uterine fibroid treatment with Lupron injections, and that Hopkins stated "'I need surgery.'" (R. 163-64.)  Treatment notes also state: "Reinforcement of nutrition education provided for patient's understanding to quit smoking, make healthy choices and eat healthy to control medical conditions that exist. [] Exercise tips and cooking tips for the holidays provided to aid patient towards goals." (R. 158.)  On November 18, 2009, Hopkins weighed 241 pounds, records show uterine fibroid treatment with Lupron injections.  (R. 161.)  On December 16, 2009, Hopkins weighed 238 pounds with a BMI of thirty-five.  (R. 159.)

### **2010**

On February 3, 2010, Hopkins reported: "'I feel so much better after Lupron injection'" and "'I like Lupron . . . .'" (R. 151.)  On February 16, 2010, Hopkins weighed 236 pounds with a BMI of thirty-five, and was treated for hypertension, obesity and a thyroid goiter.  (R. 149.)  On March 3, 2010, Hopkins weighed 238 pounds, was given her last Lupron injection, and stated that she "'feel[s] wonderful.'" (R. 147-48.)

On April 13, 2010, Hopkins weighed 241 pounds with a BMI of thirty-six and complained of muscle spasms and numbness in her left leg.  (R. 145.)  Hopkins reported that she smoked cigarettes and had gained weight from the Lupron injections.  (R. 145.)  She was prescribed Flexeril for the muscle spasms and advised to continue her current medications.  (R. 145-46.)  Treatment notes also reflect hypertension, a thyroid goiter, anemia and sciatica.  (R. 145.)  On June 2, 2010, Hopkins weighed 249 pounds and stated that she was "feeling much better after Lupron [t]herapy." (R. 141.)  On June 7, 2010, Hopkins weighed 246 pounds and presented for a thyroid goiter evaluation.  (R. 139-40.)

On June 11, 2010, Hopkins weighed 246 pounds with a BMI of thirty-six, and complained of joint pain in her knees and chronic lower back pain.  (R. 137.)  Treatment notes state she was unable to take Flexeril during the day because it caused drowsiness, her anemia was "improved," and "weight loss" and "smoking cessation" were recommended for her hypertension and obesity.  (R. 137-38.)  Records also indicate uterine fibroids, sciatica and a thyroid goiter, and that Hopkins requested her medical records for a social security disability claim.  (R. 137-38.)

On July 14, 2010, Hopkins weighed 252 pounds with a BMI of thirty-eight.  (R. 136.) Hopkins complained of "limb pain" and reported that she was seen by a physiatrist who had taken x-rays and recommended physical therapy, and that Naproxen and Gabapentin caused drowsiness. (R. 136.)  Treatment notes indicate radiculopathy, sciatica and knee joint pain, and state that Hopkins' anemia was "resolved," her hypertension was "stable" and "smoking cessation" was recommended.  (R. 136.)  Records also indicate that Hopkins "request[ed a] letter stating she's unable to work for 1 yr for disability w/ Binder/Binder law office."  (R. 136.)

### Viola Gittens, LCSW

Hopkins saw licensed clinical social worker Viola Gittens on April 22, 2010, May 21, 2010 and June 11, 2010.  (R. 143-44.)  On June 11, 2010, Gittens noted that Hopkins reported that she "[w]as offered 2 jobs but turned them down since she has so many medical appointments scheduled."  (R. 144.)  On July 14, 2010, Hopkins reported that her feelings of depression had been "treated."  (R. 136.)

### Bronx-Lebanon Hospital Center / Dr. Marshall Kurtz

On June 29, 2010, Dr. Marshall Kurtz saw Hopkins for complaints of intermittent pain and muscle spasms in both legs that Hopkins said began in November 2009 and had "become constant" "in the last couple of months."  (R. 304.)  Hopkins reported pain "from the right hip to the

right ankle and from the left hip to the left thigh" that felt tight and "crampy" with "a burning quality." (Id.) According to Hopkins, ibuprofen did not alleviate her pain and Flexeril "caused significant sedation." (Id.) Hopkins denied leg weakness, falls or instability. (Id.) Dr. Kurtz noted Hopkins' past medical history included hypertension and "uterine fibroids for which the patient underwent two courses of Lupron." (Id.) On examination, Dr. Kurtz found Hopkins was "in mild discomfort" with mild guarding on sit-to stand transfer. (Id.) Hip range of motion was full without pain, and straight leg raise was equivocal to positive on the right and negative on the left. (Id.) Dr. Kurtz noted puffiness with mild effusion in the left knee, none in the right knee, full range of motion with mild crepitus, and patellofemoral compression pain. (Id.) "There was no varus valgus laxity, anterior posterior drawer, McMurray and Lachman test[s] were negative." (Id.) Dr. Kurtz diagnosed "[b]ilateral sciatica, likely secondary to lumbar disc degeneration," and "[b]ilateral knee arthropathy." (Id.) Dr. Kurtz ordered knee and lumbar spine x-rays, recommended physical therapy, and prescribed Naproxen and Gabapentin for pain and discontinuance of the Flexeril. (Id.)

X-rays of Hopkins' knees and lumbar spine were taken on July 1, 2010. (R. 321.) Her lumbar spine x-ray showed retrolisthesis of L4-5 with multilevel degenerative disk disease. (R. 321.) Her knee x-ray showed lateral subluxation of the bilateral tibias with degenerative changes, and it was indicated that an "MRI or CT would be helpful to further evaluate." (R. 321.)

**July 19, 2010 Through November 4, 2011**

**Bronx-Lebanon Hospital Center / Dr. Marshall Kurtz**

Hopkins underwent physical therapy at Bronx-Lebanon on August 5, 2010. (R. 305.)

On August 17, 2010, Hopkins presented to Dr. Kurtz complaining of continued lower back pain radiating to both lower extremities, and continued bilateral knee pain with intermittent buckling and multiple falls. (R. 317.) Hopkins had been compliant with physical therapy, and

reported that Naprosyn provided no relief and Gabapentin caused "excessive sedation."  (R. 317.)  On examination, Hopkins' gait and sitting-standing transfers were antalic.  (R. 317.)  Range of motion in Hopkins' lumbar spine was "limited." (R. 317.)  Range of motion in her knees was normal with minimal effusion on the left but none on the right, and there was slight crepitus but no signs of meniscal or ligamentous laxity.  (R. 317.)  Her neuromuscular examination was unchanged.  (R. 317.)  Hopkins' lumbar spine x-ray revealed sacralization of L5 and minimal degenerative signs, and the x-ray of her knees revealed minimal to mild degenerative changes.  (R. 317.)  Dr. Kurtz diagnosed "[b]ilateral lumbar radiculopathy with possibility of lumbar disk injury," "[m]ild bilateral knee osteoarthritis" and "[m]orbid obesity." (R. 317.)  Dr. Kurtz recommended a lumbar spine MRI to rule out compressive lesion, continuing physical therapy and home exercise, and prescribed patellar stabilizing knee orthoses.  (R. 317.)

Hopkins continued physical therapy twice a week from August 17, 2010 through September 9, 2010.  (R. 306, 322.)

### Consultative Physician Dr. Mark Johnston

On November 10, 2010, Hopkins saw consultative physician Dr. Mark Johnston of Industrial Medicine Associates in connection with her SSI application.  (R. 323-26.)  Hopkins complained of "a long history of low back pain" that "is worse with stooping and bending."  (R. 323.)  Hopkins reported "modest relief" from physical therapy and rated "the pain as 10 out of 10 on most days." (R. 323.)  Hopkins also complained of "bilateral knee pain which is triggered by standing more than about 15 minutes" and "bending the knees."  (R. 323.)  For the knee pain, Hopkins reported that physical therapy "has not been particularly helpful," but that she had been using "prescribed bilateral knee braces" for roughly two months which she thought "may be helping slightly."  (R. 323.)

Dr. Johnston noted a thirteen-year history of hypertension and a thyroid goiter that had not been treated with medication.  (R. 323.)  Hopkins weighed 260 pounds and reported smoking "two packs a day . . . since the 1990s."  (R. 324.)  Hopkins stated that she was "able to do the cooking, cleaning, and laundry," and "able to shop, shower, bathe, and dress herself," and that she enjoyed "watching TV and reading."  (R. 324.)

Dr. Johnston noted that Hopkins appeared to be in no acute distress, had a normal gait and stance, could walk on heels and toes and rise from a chair without difficulty, used no assistive devices, and needed no help changing for the exam or getting on and off the exam table.  (R. 324.)  On examination, Dr. Johnston diagnosed "[c]hronic low back pain without radicular findings," "bilateral knee pain," hypertension, thyromegaly and obesity.  (R. 325-26.)  Dr. Johnston gave Hopkins a "[g]ood" prognosis, stating that she had "a moderate limitation of her ability to bend, lift, or carry secondary to low back pain" and "a moderate limitation of her ability to stoop or kneel secondary to knee discomfort."  (R. 326.)

### State Physical Residual Functional Capacity Assessment

On November 22, 2010, B. Beavan completed a State Physical Residual Functional Capacity Assessment.  (R. 327-32.)  Beavan indicated degenerative disc disease and bilateral knee degenerative joint disease as Hopkins' primary and secondary diagnoses, respectively, as well as hypertension, thyromegaly and obesity as "other alleged impairments."  (R. 327.)  Based on medical records including Dr. Johnston's consultative assessment, Beavan noted that Hopkins weighed 260 pounds, and found that she could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk a total of six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and/or pull without limitation.  (R. 328-29.)  Beavan found that Hopkins had occasional postural limitations climbing (ramp/stairs and

ladder/rope/scaffolds), balancing, stooping, kneeling, crouching and crawling, based on her "[d]ecreased range of motion of LS-spine and knees with degenerative changes on x-ray." (R. 329.) Beavan found that Hopkins had no manipulative, visual, communicative or environmental limitations. (R. 329-30.)

Beavan opined that "[w]hile [Hopkins'] allegations are credible, the medical evidence in file does not support the severity alleged." (R. 331.) Beavan noted that Hopkins "is able to perform her personal activities of daily living, light cooking, light cleaning, and light shopping," that she "travels independently" and "socializes with friends and family." (R. 331.) "Based on the medical evidence in file," Beavan concluded that Hopkins "has a light RFC" and "is able to return to her past relevant work as a daycare attendant." (R. 332.)

### Bronx-Lebanon Hospital Center

On February 1, 2011, Hopkins underwent an MRI of her knees, which revealed "[s]evere lateral chondromalacia of the patella with absence of the cartilage and osteophytes at the lateral patellofemoral joint and lateral subluxation of the patella" in both knees. (R. 341-42.) "The quadriceps tendon, patellar tendon, lateral collateral ligament, anterior and posterior cruciate ligaments," and "medial and lateral menisci" were all "normal." (R. 341-42.)

### Dr. Margaret Meyer's Physical Residual Functional Capacity Questionnaire

Dr. Margaret Meyer of BronxCare Orthopedics completed a Physical Residual Functional Capacity Questionnaire on September 7, 2011. (R. 343-47.) Dr. Meyer indicated she saw Hopkins every six months and Hopkins' first visit had been March 8, 2011. (R. 343.) Dr. Meyer diagnosed bilateral patellofemoral degenerative joint disease with a fair prognosis. (R. 343.) Hopkins' symptoms included knee pain with sitting and standing in all positions, which was precipitated by activity and increased with walking and sitting. (R. 343.) Dr. Meyer rated Hopkins'

pain as ten out of ten.  (R. 343.)  Dr. Meyer indicated Hopkins' impairments were reasonably consistent with her symptoms and functional limitations, noting that degenerative joint disease of the knees is painful.  (R. 344.)  Dr. Meyer opined that Hopkins' symptoms would "[c]onstantly" interfere with the attention and concentration needed to perform simple work tasks, that her impairments were "likely to produce 'good days' and 'bad days,'" and that she would be absent from work about four days per month as a result of her impairments.  (R. 344, 346.)  Dr. Meyer indicated that Hopkins was "[i]ncapable of even 'low stress' jobs," but provided no explanation for that conclusion in the space provided.  (R. 344.)

Dr. Meyer opined that: Hopkins could walk less than one city block without rest or severe pain.  (R. 344.)  Hopkins could sit for one hour at a time before needing to get up and for less than two hours total in an eight-hour workday.  (R. 344-45.)  Hopkins could stand for ten minutes at a time before needing to sit down or walk around, and could stand/walk for less than two hours total in an eight-hour workday.  (R. 344-45.)  In a typical eight-hour workday, Hopkins would need to get up and walk around eight times for ten minutes at a time, and must use a cane or other assistive device during occasional standing/walking.  (R. 345.)  Dr. Meyer opined that Hopkins needs a job that permits shifting positions from sitting, standing or walking at will, and that Hopkins would need one to two unscheduled ten-minute breaks during an eight-hour workday.  (R. 345.) Hopkins could frequently twist and stoop/bend, rarely climb stairs and never crouch/squat or climb ladders.  (R. 346.)  Dr. Meyer opined that Hopkins frequently could look down (sustained flexion of neck), turn her head right or left, look up, and hold her head in static position.  (R. 346.)  Hopkins had no significant limitations with reaching, handling or fingering, and she could occasionally lift and carry ten pounds or less, rarely twenty pounds and never fifty pounds.  (R. 345-46.)

**ALJ Hecht's Decision**

On November 4, 2011, ALJ Hecht issued a written decision denying Hopkins' application for SSI benefits. (R. 8-18.)

ALJ Hecht conducted a five-step analysis, considering Hopkins' testimony and the medical record. (R. 11-18.) First, ALJ Hecht found that Hopkins had not engaged in substantial gainful activity since her application date of July 19, 2010. (R. 13.) Second, he determined that Hopkins had the following severe impairments: degenerative disk disease, degenerative joint disease (bilateral knees), hypertension, a thyroid condition, obesity and uterine fibroids. (R. 13-14.) Third, ALJ Hecht found that Hopkins did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (R. 14.)

ALJ Hecht determined that Hopkins retained the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 416.967(a). (R. 15-17.) ALJ Hecht found that Hopkins is able to lift and/or carry up to ten pounds, sit for a total of six hours, and stand and/or walk for two hours out of an eight-hour workday. (R. 15-17.) ALJ Hecht considered Hopkins' subjective allegations and testimony, but did not find them to be "reasonably consistent with the medical evidence." (R. 15.) ALJ Hecht noted that although Hopkins "reported pain that was a 'ten out of ten' on most days and bilateral knee pain whenever standing more than about 15 minutes, the objective testing . . . is inconsistent with these allegations." (R. 15-16.) Additionally, ALJ Hecht found that "[s]ome non-compliance issues exist," citing Hopkins' admission "that she was not taking her medication to control hypertension symptoms." (R. 16.) ALJ Hecht also found that Hopkins "can perform a full range of daily activities, which is inconsistent with the nature, severity and subjective complaints." (R. 16.)

ALJ Hecht gave "significant weight" to Dr. Johnston's November 10, 2010 assessment "because an objective evaluation was performed that is consistent with the record, indicating [Hopkins] could perform sedentary work." (R. 16.)  ALJ Hecht did "not give much weight" to Dr. Meyer's September 7, 2011 residual functional capacity assessment. (R. 16-17.) ALJ Hecht noted that Dr. Meyer "had only been treating the claimant since March 2011 but completed the assessment by September 2011, indicating limited contact." (R. 17.)  Additionally, "Dr. Meyer did not provide a detailed analysis of the clinical findings or objective findings to support the significant limitations listed." (R. 17.)  "Without sufficient documentation" as to the basis for the significant limitations, ALJ Hecht "assume[d] that Dr. Meyer relied heavily on [Hopkins'] subjective complaints while attempting to qualify for benefits." (R. 17.)  ALJ Hecht found that while some limitations resulted from Hopkins' knee problems, they "have been addressed by the sedentary residual functional capacity." (R. 17.)  Finally, ALJ Hecht "only assign[ed] some weight" to Beavan's November 22, 2010 State residual functional capacity assessment finding Hopkins could perform light work based on her "ability to perform her daily living activities without problems," because Beavan "was not an acceptable medical source and [Hopkins'] impairments would limit her to sedentary work based on the record as a whole." (R. 17.)

At the fourth step, ALJ Hecht determined that, in light of Hopkins' residual functional capacity, she was able to perform her past relevant work as a bank data processor, as actually and generally performed. (R. 17.)  Alternatively, ALJ Hecht proceeded to the fifth step, finding that jobs existed in the national economy that Hopkins also could perform. (R. 17-18.) ALJ Hecht found that Hopkins was "37 years old, which is defined as a younger individual age 18-44, on the date the application was filed," had "at least a high school education and is able to communicate in English," and "[t]ransferability of job skills is not material to the determination of disability." (R. 17.)

"Considering [Hopkins'] age, education, work experience, and residual functional capacity," ALJ Hecht found that "there are other jobs that exist in significant numbers in the national economy that [Hopkins] also can perform." (R. 18.)  ALJ Hecht applied the corresponding Medical-Vocational Rule 201.28 for those capable of performing sedentary work, and explained that "considering [Hopkins'] age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule[s]." (R. 18.)  ALJ Hecht concluded that Hopkins was not "under a disability, as defined in the Social Security Act, since July 19, 2010, the date the application was filed." (R. 18.)

**Appeals Council Decision and Additional Medical Evidence**

On January 6, 2012, Hopkins requested review by the Appeals Council. (R. 7.)  In connection with her request for review of ALJ Hecht's decision, Hopkins submitted progress notes regarding her knee treatment from BronxCare Orthopedics dated March 8, 2011 through December 9, 2011. (See R. 4-5, 348-73.)

### Additional Medical Evidence before the Appeals Council

#### Prior to November 4, 2011

On March 8, 2011, Hopkins saw Dr. Meyer for a consultation regarding her knees. (R. 348-52.)  Hopkins rated her pain as six out of ten and reported no uncontrolled pain. (R. 349, 351.)  Dr. Meyer instructed Hopkins to continue taking her medication including Tramadol, Lexapro, Gabapentin and Naprosyn for pain, and to continue using the prescribed bilateral patellar-stabilizing knee orthoses. (R. 348.)

On March 9 and May 24, 2011, Hopkins saw Dr. Ponle Durojaye for follow-up visits. (R. 353-59.)  Hopkins arrived at both visits unaccompanied and walking. (R. 353, 357.)  Hopkins had no uncontrolled pain. (R. 353, 357.)  Dr. Durojaye noted that Hopkins had refused corticosteroid knee injections and instructed her to consider the option and follow up. (R. 354.)

Hopkins reported she stopped taking the Lexapro and Tramadol due to nausea and dizziness, and Dr. Durojaye instructed Hopkins to continue with her medications and knee orthoses.  (R. 353-54, 356, 359.)

On June 7, 2011, Hopkins saw Dr. Durojaye for a follow-up visit with no new complaints.  (R. 360-63.)  Dr. Durojaye noted that Hopkins complained of "chronic knee pain especially on the right" and that Hopkins "previously did not want corticosteroid injections."  (R. 360.)  Hopkins reported chronic and uncontrolled pain including during the prior twenty-four hours. (R. 360.)  Dr. Durojaye assessed benign hypertension and hypertension not otherwise specified, which were "controlled," and tobacco use disorder.  (R. 362-63.)

On June 15, 2011, Hopkins saw Dr. Christopher Leggett for a psychiatric assessment. (R. 364-65.)  Dr. Leggett noted a physical medical history of chondromalacia in bilateral knees, myalgia, obesity and degenerative disk disease.  (R. 364.)  Hopkins reported a depressed mood starting approximately two years ago when she graduated from college but was unable to find a job. (R. 364.)  Hopkins stated she was "flunking-out of an online master's program," had low energy and poor concentration, and that her Lexapro prescription "has yielded minimal benefit."  (R. 364.)  On examination of her mental status, Dr. Leggett found Hopkins was alert and oriented, her insight, judgment and impulse control were adequate, she had no psychotic symptoms and no suicidal or homicidal ideation.  (R. 364.)  Dr. Leggett indicated Hopkins would discontinue Lexapro and start taking Cymbalta.  (R. 364.)

On September 7, 2011, Hopkins saw Dr. Meyer with knee pain complaints.  (R. 366-68.) Dr. Meyer noted that Hopkins was in tears and rated her pain as ten out of ten, and that physical therapy was "not helping."  (R. 366.)  Hopkins reported that the pain worsened with ambulation, squatting and climbing stairs, and improved with medication and rest.  (R. 366.)  Dr. Meyer

diagnosed chondromalacia patella and prescribed anti-inflammatory medication, physical therapy and a continuous stretching program.  (R. 366.)  Dr. Meyer injected both knees with Kenalog and Marcaine to alleviate the pain.  (R. 366.)

### After November 4, 2011

On December 9, 2011, Dr. Meyer completed a surgery request indicating chondromalacia patellae as the problem requiring surgical treatment.  (R. 369-70.)  Dr. Meyer requested approval for "knee arthroscopy/surgery" and to "repair degenerated kneecap" in Hopkins' right knee, with the comment "fulkerson osteotomy."  (R. 369.)

### Appeals Council Decision

After considering the newly submitted medical records, the Appeals Council "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (R. 2; see R. 4-5.)  On May 10, 2013, the Appeals Council denied Hopkins' request for review of ALJ Hecht's decision and it became the Commissioner's final decision.  (R. 1-3, 5.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[1]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[2]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

---

[1] See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[2] See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[3/]

**B.    Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[4/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[5/]

---

[3/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[4/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[5/]    See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[6/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[7/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

---

[6/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[7/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); <u>accord</u>, <u>e.g.</u>,

<u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v.

<u>Apfel</u>, 167 F.3d at 774.[8/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[8/]   <u>See also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d at 106; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d at 501; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[9/]

### C.    The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[10/]

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

---

[9/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[10/]    See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47;  Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[11/]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the

---

[11/]   See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

### D.     The ALJ's Duty to Develop the Record

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." <u>Lamay</u> v. <u>Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)[, <u>cert. denied</u>, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; <u>accord</u> <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 386 (2d Cir. 2004), [<u>amended on other grounds</u>], 416 F.3d 101 (2d Cir. 2005); <u>Pratts</u> v. <u>Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996); <u>see also</u> <u>Gold</u> v. <u>Sec'y of Health, Educ. & Welfare</u>, 463 F.2d 38, 43 (2d Cir. 1972) (<u>pro se</u> claimant). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." <u>Butts</u>, 388 F.3d at 386 (internal quotation marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." <u>Id.</u> (internal quotation marks omitted); <u>accord</u> <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999).

<u>Moran</u> v. <u>Astrue</u>, 569 F.3d 108, 112-13 (2d Cir. 2009).[12/]

---

[12/]     <u>See also</u>, <u>e.g.</u>, 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d), 416.912(e)(2); <u>Padula</u> v. <u>Astrue</u>, 514 F. App'x 49, 51 (2d Cir. 2013); <u>Winn</u> v. <u>Colvin</u>, 541 F. App'x 67, 70 (2d Cir. 2013); <u>Burgess</u> v. <u>Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996); <u>Echevarria</u> v. <u>Sec'y of Health & Human Servs.</u>, 685 F.2d 751, 755 (2d Cir. 1982); <u>Torres</u> v. <u>Barnhart</u>, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

II.     **APPLICATION OF THE FIVE-STEP SEQUENCE TO HOPKINS' CLAIM**

A.     **Hopkins Was Not Engaged In Substantial Gainful Activity**

The first inquiry is whether Hopkins was engaged in substantial gainful activity after her application for DIB and SSI benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  Since ALJ Hecht's conclusion that Hopkins did not engage in substantial gainful activity during the applicable time period (see page 14 above) is not disputed and benefits Hopkins, the Court proceeds to the second step of the five-step analysis.

B.     **Hopkins Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Hopkins proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . .  seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).  "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"

<u>McDowell</u> v. <u>Colvin</u>, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), <u>report & rec. adopted</u>, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[13/]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." <u>Rosario</u> v. <u>Apfel</u>, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the <u>de minimis</u> level, then the further analysis of step three and beyond must be undertaken. <u>See</u>, <u>e.g.</u>, <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" <u>Rosario</u> v. <u>Apfel</u>, 1999 WL 294727 at *5 (quoting <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Hecht determined that the medical evidence indicated that Hopkins had the severe impairments of degenerative disk disease, degenerative joint disease (bilateral knees), hypertension, a thyroid condition, obesity and uterine fibroids.[14/]  (<u>See</u> page 14 above.) ALJ Hecht's

---

[13/]    <u>Accord</u>, <u>e.g.</u>, <u>Whiting</u> v. <u>Astrue</u>, No. Civ. A. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any <u>limitations it may impose upon the claimant's ability to perform basic work functions</u>, that is pivotal to the disability inquiry.'"), <u>report & rec. adopted</u>, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); <u>Lohnas</u> v. <u>Astrue</u>, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), <u>aff'd</u>, 510 F. App'x 13 (2d Cir. 2013); <u>Hahn</u> v. <u>Astrue</u>, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.' Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); <u>Rodriguez</u> v. <u>Califano</u>, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

[14/]    The parties' focus on this appeal is on Hopkins' back and knee conditions and obesity. (<u>See</u>
                                                                                            (continued...)

finding regarding the severity of Hopkins' impairments benefits Hopkins and the Court therefore proceeds to the third step of the five-part analysis.

### C.      Hopkins Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Hopkins had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Hecht found that Hopkins "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. 14; see page 14 above.)  Specifically, ALJ Hecht found that "[t]he signs and laboratory findings fail to meet the severity required for listing 1.04, disorders of the spine," and that Hopkins' "bilateral knee degenerative joint disease fails to meet the severity required for listing 1.02, major dysfunction of a joint(s)."  (R. 14.)  In addition, ALJ Hecht found that "the limitations caused by [Hopkins'] obesity are not significant enough to equal the severity of any medical listing."  (R. 14.)

Section 1.04 outlines the conditions required to establish disorders of the spine.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.  Specifically, to constitute an Appendix 1 listed impairment, Hopkins' back problems must qualify as a disorder

---

14/      (...continued)
Dkt. No. 13: Hopkins Br. at 9-16; Dkt. No. 21: Gov't Br. at 15-24.)  Accordingly, the Court will limit its discussion to those conditions in the balance of this Report and Recommendation.

(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.

Section 1.02 outlines the conditions required to establish disorders of the joint.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.  To constitute an Appendix 1 listed impairment, Hopkins' bilateral knee pain must qualify as "[m]ajor dysfunction of a joint(s)," characterized by:

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.

Under Section 1.03, impairment can also arise from:

Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.03.

"Inability [t]o ambulate effectively" means:

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). "To ambulate effectively,"

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

The diagnosis of obesity is addressed generally throughout the listing of impairments

in multiple sections, including § 1.00, as follows:

Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation

process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q).  Obesity thus must be considered in light of the effects it causes on the body.

ALJ Hecht's conclusion that Hopkins did not have a listed impairment is supported by substantial evidence and not disputed by Hopkins' counsel.  (See generally Dkt. No. 13: Hopkins Br. at 9-14.)  For example, with respect to Hopkins' back pain, "[i]maging of the lumbar spine showed sacralization of L5 and minimal degenerative signs without nerve root or spinal cord compromise." (R. 14, emphasis added.)  With respect to Hopkins' bilateral knee pain, examinations by Dr. Kurtz on June 29 and August 17, 2010 "showed a normal range of motion with minimal effusion on the left and none on the right," and her July 1, 2010 x-rays "indicated minimal to mild degenerative changes." (R. 14; see pages 8-10 above.)  Likewise, while her February 1, 2011 MRI "showed severe lateral chondromalacia," the imaging revealed that "the quadriceps tendon, patellar tendon, lateral collateral ligament and cruciate ligaments were normal." (R. 14; see page 12 above.)  Hopkins was able to ambulate effectively—she travels to medical appointments by herself, goes to church and while she uses a knee brace, she does not need a walker or canes.  (See pages 3-4 above.)  Finally, with respect to Hopkins' obesity, Dr. Johnston's November 10, 2010 examination specifically diagnosed obesity yet found that Hopkins "was capable of performing her daily activities without limits from her obesity symptoms."  (R. 14; see page 11 above.)

Because ALJ Hecht's finding that Hopkins' impairments do not meet or medically equal the listed conditions is not disputed by the parties (see generally Dkt. No. 13: Hopkins Br.; Dkt. No. 21: Comm'r Br.; Dkt. No. 22: Hopkins Reply Br.), the Court proceeds with the five-step analysis.

Before proceeding to step four, however, the Court will address ALJ Hecht's credibility and residual functional capacity determinations.

## 1.    Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[15/]  In

---

[15/]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] (continued...)

addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[16/]

        ALJ Hecht considered Hopkins' "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and determined that Hopkins' "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Hopkins'] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." (R. 15.)[17/]

---

[15/]     (...continued)
to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[16/]     Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[17/]     This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC
                             (continued...)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[18]

_____

[17]    (...continued)
first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and "prejudicial to the claimant." Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); see also, e.g., Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.); Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *17 n.18 (S.D.N.Y. May 13, 2014) (Peck, M.J.). Nevertheless, while ALJ Hecht's language leaves something to be desired, here unlike in Cruz, he gave sufficient explanation for finding Hopkins' claim of disabling knee and back pain to lack credibility—including careful review of the contrary medical evidence and Hopkins' admissions that her activities of daily living largely have not been impacted by her medical impairments—that the Court concludes the ALJ's finding is supported by substantial evidence and a remand is not called for. See, e.g., Givens v. Colvin, 2014 WL 1394965 at *10 n.18; Paulino v. Colvin, 2014 WL 2120544 at *17 n.18.

[18]    Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

ALJ Hecht properly applied this two-step process to Hopkins' case. (R. 15-17.) ALJ Hecht assessed Hopkins' credibility by considering all of the relevant medical evidence in the record in light of Hopkins' statements. (R. 15-17.)

First, ALJ Hecht found "that although [Hopkins] reported pain that was a 'ten out of ten' on most days and bilateral knee pain whenever standing more than about 15 minutes, the objective testing" was "inconsistent with these allegations." (R. 15-16.) An examination by Dr. Kurtz on June 29, 2010 showed straight leg raise testing was negative on the left, normal range of motion in her knees with only minimal effusion on the left and none on the right, mild crepitus in her hip range of motion, and all other clinical tests were negative. (R. 15; see pages 8-9 above.) "Although there was slight crepitus in the knees, no signs of meniscal or ligamentous laxity were present." (R. 15.) July 1, 2010 x-rays of Hopkins' lumbar spine "revealed minimal degenerative signs" and "imaging of the knees showed minimal to mild degenerative changes." (R. 15.) Additionally, the "[t]reatment prescribed was relatively conservative, involving physical therapy, ergonomics, use of home modalities, home exercises, and [Hopkins'] treating provider did not advise surgery." (R. 15.) Hopkins "reported modest relief from her back pain with physical therapy." (R. 15.) Therefore, ALJ Hecht correctly concluded that Hopkins' "subjective complaints [of back pain] are not reasonably consistent with the medical evidence." (R. 15.)[19] See, e.g., Penfield v. Colvin, No. 13-2225-cv, --- F. App'x ----, 2014 WL 1673729 at *2 (2d Cir. Apr. 29, 2014) ("After

---

[19]  The Court is not persuaded by Hopkins' argument that ALJ Hecht mischaracterized statements that Hopkins was "'doing well'" and that she felt "'wonderful'" as relating to her "assessment of her orthopedic condition" instead of to her uterine fibroids. (Dkt. No. 13: Hopkins Br. at 13-15.) Quite to the contrary, ALJ Hecht clearly did not relate those statements to Hopkins' orthopedic condition; instead, after mentioning those statements, he then began the discussion of her orthopedic conditions as indicated by his use of the following transitional phrase: "Regarding the claimant's back and legs . . . ." (R. 15.)

extensively detailing the medical evidence and [the claimant's] testimony, the ALJ afforded her statements only 'partial credibility' because 'they were inconsistent with the objective evidence in the record.'  Our independent review of the administrative record supports the ALJ's credibility determination.  For example, while [the claimant] testified that her constant pain prevented her from standing for more than five minutes without leaning against something or dressing herself without assistance, her treating physician consistently prescribed a 'conservative treatment' regimen that consisted of 'walking[,] home exercise program[s],' and 'gentle stretching.'  In addition, [the claimant's] testimony that she could not sit for more than five minutes at a time during the relevant period and that the combination of her pain and the medications she took for that pain made her unable to concentrate is inconsistent with the fact that, during that same time, she successfully completed a computer training course that required her to take four-hour classes three days per week."); McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) ("'ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'"); Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *14 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) ("'[T]he level of medical treatment documented to date is not commensurate with the claimant's pain allegations.'  Besides [the claimant's] right knee meniscal tear diagnosis and the subsequent arthroscopic surgery, all other examinations and treatments were conservative in nature and showed that [the claimant's] alleged conditions were mild.  In addition, as [the ALJ] pointed out, the 'Radiographic studies (x-rays, CT scans, and MRI studies) have consistently chronicled slight/mild clinical orthopedic findings.'  Regarding [the claimant's] shoulder pain, [the doctor] diagnosed her with right shoulder impingement syndrome and two subsequent MRI studies revealed mild tendinosis of the superior rotator cuff, mild arthrosis of the AC joint, and mild bursitis.

Regarding [the claimant's] hip pain, x-rays revealed only mild degenerative changes bilaterally. Moreover, both tests used to evaluate [the claimant's] back pain, a CT scan and an MRI of the lumbar spine, showed mild or minimal disc bulges and mild L5-S1 degenerative disc space narrowing. [The claimant's] medical records show that she has no abnormalities in terms of gait or station, and that she maintains intact neurological functioning. Therefore, [the ALJ] correctly concluded that 'the objective medical evidence fails to corroborate contentions of total disability.' ((citations omitted)); Jones v. Comm'r of Soc. Sec., 12 Civ. 6164, 2013 WL 4482702 at *9 (S.D.N.Y. Aug. 22, 2013) (ALJ's finding that plaintiff was not disabled was supported by substantial evidence where, inter alia, "notwithstanding Plaintiff's complaints, his treatment was largely conservative and never required inpatient care").

Second, ALJ Hecht found that Hopkins "can perform a full range of daily activities, which is inconsistent with the nature, severity and subjective complaints of" Hopkins' alleged limitations. (R. 16.) ALJ Hecht noted that Hopkins has been able to take care of herself and her three children in terms of showering, grooming and dressing on a daily basis. (See page 3 above.) Hopkins is able to do most light chores around the house, including cooking, cleaning and doing laundry. (See page 3 above.) Hopkins also watches television, reads, attends physical therapy twice weekly, attends church, and most importantly, takes online classes towards her master's degree. (See pages 2-3 above.) ALJ Hecht held that "[t]hese activities do not reflect the disabling limitations alleged by" Hopkins. (R. 16.)

Thus, ALJ Hecht met his burden in finding Hopkins' claims not entirely credible because the objective medical evidence failed to support her claims of disability and she remains functional in terms of activities of daily living. See, e.g., Hilliard v. Colvin, 2013 WL 5863546 at *15 (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she

remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain."); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Givens v. Colvin, 2014 WL 1394965 at *10-11 (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Spina v. Colvin, No. 11-CV-1496, 2014 WL 502503 at *8 (N.D.N.Y. Feb. 7, 2014) ("the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence and will not be disturbed" where "there is evidence that [claimant] has not been wholly compliant in taking prescribed medications or following instructions," including "to quit smoking," and "he 'cares for all his own personal care needs, cooks simple meals, does house and yard work when he feels ok, does laundry, shops, . . . plays video games, and socializes'"); Ridgeway v. Colvin, No. 12-CV-6548, 2013 WL 5408899 at *9-10 (W.D.N.Y. Sept. 25, 2013) ("[T]he ALJ measured Plaintiff's credibility by evaluating all of the required factors bearing on Plaintiff's credibility prior to deciding Plaintiff's RFC.  She discussed Plaintiff's daily activities, frequency and intensity of Plaintiff's symptoms, Plaintiff's compliance with physician directions and the treatment of Plaintiff's symptoms.  The ALJ determines issues of credibility and great deference is given her judgment.  The ALJ noted that despite complaints of disabling limitations, Plaintiff did household chores, attended college level courses as well as computer courses and cared for her young grandson.  Moreover, she did not take

her health care seriously as she failed repeatedly to take the prescribed medications.  The ALJ also noted that Plaintiff did not keep appointments and had poor follow-up and did not see a dietician as directed by her doctor on several occasions. . . . Accordingly, Plaintiff's argument that the ALJ failed to properly assess her subjective complaints is rejected." (citations omitted, emphasis added)); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("[I]n making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations . . . ."), report & rec. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2.    Residual Functional Capacity Determination

ALJ Hecht determined that Hopkins "has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a)" (R. 15), which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," and requires "walking and standing" only "occasionally."  20 C.F.R. § 416.967(a).  Specifically, ALJ Hecht concluded that Hopkins is able to (1) "lift and/or carry up to ten pounds," (2) "stand and/or walk two hours out of an eight-hour workday," and (3) "sit six hours out of an eight-hour workday."  (R. 15.)  ALJ Hecht's assessment that Hopkins is able to perform a full range of exertionally sedentary work is based on substantial evidence.

### a.    ALJ Hecht Properly Applied the Treating Physician Rule

Hopkins contends that the ALJ violated the treating physician rule by failing to afford adequate weight to Dr. Meyer's opinions that Hopkins' pain "would 'constantly' be severe enough to interfere with . . . even simple work tasks," and that her "conditions would prevent her from doing even sedentary work, i.e. she was unable to sit or to stand/walk for even two hours in an eight-hour work day."  (Dkt. No. 13: Hopkins Br. at 9-13; see R. 17.)  Even though "the treating physician rule

generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted).[20] Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner." Mack v. Comm'r of Soc. Sec., 12 Civ. 186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[21]

ALJ Hecht found that Dr. Meyer "had only been treating [Hopkins] since March 2011 but completed the [residual functional capacity questionnaire] assessment by September 2011, indicating limited contact." (R. 17.)  Indeed, as the additional records that Hopkins submitted to the Appeals Council (see pages 16-18 above) made clear, Hopkins was treated personally by Dr. Meyer

---

[20]    Accord, e.g., Penfield v. Colvin, No. 13-2225-cv, --- F. App'x ----, 2014 WL 1673729 at *1 (2d Cir. Apr. 29, 2014); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given."); Jimenez v. Astrue, 12 Civ. 3477, 2013 WL 4400533 at *10 (S.D.N.Y. Aug. 14, 2013) ("[T]he opinions of a treating physician 'need not be given controlling weight where they are contradicted by other substantial evidence in the record.'"); Van Dien v. Barnhart, 04 Civ. 7259, 2006 WL 785281 at *9 (S.D.N.Y. Mar. 24, 2006) ("[The] general rule of deference does not apply where 'the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as opinions of other medical experts.'").

[21]    See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F. App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.).

only twice, on March 8, 2011 and again on September 7, 2011, the date on which she completed the questionnaire.  (See pages 12, 16-18 above.)  It was entirely appropriate for ALJ Hecht to consider this "limited contact" in deciding not to give controlling weight to Dr. Meyer's opinion.  See, e.g., Petrie v. Astrue, 412 F. App'x at 407-08 ("[T]he ALJ clearly considered the length of the treatment relationship and frequency of the examination in assigning minimal weight to [the treating physician's] opinion, since he noted that [the treating physician] had only four treatment notes bearing his signature, two of which appeared to be for examinations performed by another provider. [The treating physician's] own opinion states that he treated [plaintiff] 'sporadically,' and the ALJ also observed that at the time [the treating physician] rendered his opinion, it had been a year since he had last seen [plaintiff] personally.  Similarly, the ALJ assigned minimal weight to [another treating physician's] opinion because it followed only one initial appointment with [plaintiff]. . . . In sum, the ALJ gave proper consideration to all relevant factors pursuant to applicable regulations."); DiPalma v. Colvin, 951 F. Supp. 2d 555, 575 (S.D.N.Y. 2013) (Peck, M.J.) (ALJ's decision not to give weight to treating physician's opinion that claimant "is limited to less than two hours of sitting, standing, or walking and is 'capable only of performing a significantly limited range' of sedentary work" was adequately supported where treating physician "examined [claimant] on only one occasion in 2008"); Mendez v. Barnhart, 05 Civ. 10568, 2007 WL 186800 at *11 (S.D.N.Y. Jan. 23, 2007) (The ALJ "explained his reasons for assigning the opinion little weight, focusing on the short length and limited extent of the treatment relationship, a factor articulated in the regulations.  The ALJ's finding of limited contact between [the treating physician] and [plaintiff] is amply supported by the underlying medical records. [Plaintiff] was first evaluated by [the treating physician] on January 7, 2004.  When she completed the questionnaire on March 17, 2004, [the treating physician] had been treating [plaintiff] for two months and eleven days.  Based on

[plaintiff's] twice-monthly treatment plan, there would have been only five one-hour sessions in that time period." (fn. & citations omitted)); see also cases cited on page 40 above.

ALJ Hecht also found that "Dr. Meyer did not provide a detailed analysis of the clinical findings or objective findings to support the significant limitations listed." (R. 17.) Hopkins argues that the February 1, 2011 Bronx-Lebanon "MRIs of both knees showing severe bilateral degeneration of the plaintiff's patellas" constitute "objective findings supporting Dr. Meyer's opinion." (Hopkins Br. at 12.)  As the ALJ noted, however, Dr. Meyer's findings were inconsistent with the objective medical evidence, citing as an example Dr. Meyer's conclusion that Hopkins must use a cane during occasional standing or walking.  (R. 17.)  ALJ Hecht pointed out that "Dr. Johnston did not find the need for any assistive device, which was based on an objective examination." (R. 17.)[22/]  Moreover, the February 2011 Bronx-Lebanon MRIs did not provide objective support for Dr. Meyer's September 2011 findings, since Dr. Meyer also considered those MRIs when she first saw Hopkins in March 2011, at which time Dr. Meyer found Hopkins' knee pain to be well controlled with medication and orthoses, and made no mention of the need for a

---

[22/]     See, e.g., Penfield v. Colvin, 2014 WL 1673729 at *1 ("[T]he ALJ afforded the March 2010 opinion of [the treating physician] 'little weight' because, inter alia, 'the severity of [the claimant's] impairments reported by this treating physician . . . was inconsistent with the medical evidence for the period at issue.' . . . [The treating physician's] March 2010 opinion that [the claimant] could not sit for more than six hours or stand for more than two hours out of an eight-hour work day during the November 2000 to December 2005 time period was at odds not only with his own September 2002 opinion describing her 'work tolerance' as 'full time,' but also with the substantial medical evidence from that relevant period. . . . Moreover, this medical evidence supported the opinion of [another doctor]—a one-time medical examiner—thus justifying the greater weight the ALJ afforded [that other doctor's] opinion." (original alterations omitted)); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *25 (S.D.N.Y. July 2, 2008) (Peck, M.J.) (ALJ "properly could have relied on [a contradictory medical opinion] and the other evidence over the unsupported opinion of [the treating physician] about [the claimant's] need to lie down.  This Court concludes that 'the substance of the treating physician rule was not traversed.'"), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008); see also cases cited on page 40 above.

cane.  (<u>See</u> page 16 above.)  Dr. Meyer found that Hopkins had "no uncontrolled pain" and

continued conservative treatment.  (<u>See</u> page 16 above.)  The same is true of Hopkins' follow-up

visits with Dr. Durojaye in March and May 2011.  (<u>See</u> pages 16-17 above.)[23/]  Those records show

that Hopkins had no uncontrolled pain and she rejected getting corticosteroid knee injections.  (<u>See</u>

pages 16-17 above.)

   Relatedly, ALJ Hecht stated that, "[w]ithout sufficient documentation, [he] assumes

that Dr. Meyer relied heavily on the claimant's subjective complaints while attempting to qualify

for benefits."  (R. 17.)  Hopkins argues that "it was not appropriate for the ALJ to be speculating

about what the basis was for the doctor's findings without first attempting to clarify any questions

by contacting the doctor."  (Hopkins Br. at 13.)  As discussed above, however, the medical records

make clear that the only thing that changed between the March 8, 2011 and September 7, 2011 visits

_____

[23/] <u>See</u>, <u>e.g.</u>, <u>Hilliard</u> v. <u>Colvin</u>, 2013 WL 5863546 at *15 (The ALJ "found [the treating physician's] conclusion 'inconsistent with the objective medical documentation of record, and . . . primarily based upon [the claimant's] subjective pain complaints.'  Although previous reports written by [the treating physician] indicated that it was unknown when [the claimant] would be able to return to work, his May 6, 2011 report stated that [the claimant] could resume work on May 9, 2011.  On that May 6, 2011 report, [the treating physician] concluded that [the claimant] could lift up to ten pounds, stand for up to two consecutive hours, and sit for up to six consecutive hours.  <u>Nothing in the medical records between that date and December 6, 2011 justifies [the treating physician's] subsequent report that [the claimant] was limited in sitting and standing for less than two hours in an eight-hour workday</u>.  Notably, other than some complaints of pain regarding ranges of motion, [the treating physician] did not report persistent muscle spasm, sensory deficit or motor disruption.  The ALJ therefore appropriately relied on [the treating physician's] May 2011 rather than December 2011 conclusions, supported by the report of the consultative [doctor] . . . and all the medical evidence in the record.  [The consultative doctor's] report indicated some limitation of bending, squatting, and overhead reaching but not any limitations as to [the claimant's] abilities to sit, stand, walk, or lift up to ten pounds." (emphasis added & citations omitted)); <u>Paulino</u> v. <u>Astrue</u>, 08 Civ. 2813, 2010 WL 3001752 at *25 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (ALJ "had a substantial basis to disregard [the doctor's] September 2005 FEGS report concluding that [the claimant] 'can not work because of unstable physical conditions' because it appeared to 'be based entirely on [the claimant's] subjective complaints' and contradicted other medical opinions.").

with Dr. Meyer were Hopkins' "subjective complaints while attempting to qualify for benefits"—i.e., Hopkins reported her pain as a six out of ten and under control in March and May 2011, and without any objective indication that her condition was worsening, Hopkins reported her pain as a ten out of ten and uncontrolled just a few months later.  (See pages 16-17 above.)[24/]  Thus, ALJ Hecht was not required to recontact Dr. Meyer for any clarification.  See, e.g., Micheli v. Astrue, 501 F. App'x 26, 29-30 (2d Cir. 2012) ("The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician.  Rather, because it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution, the ALJ will weigh all of the evidence and see whether it can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent.  Here, the ALJ properly determined that he could render a decision based on the 500-page record already before him despite the discrepancies in [treating physician's] assessment." (citations omitted)).[25/]

---

[24/]    Indeed, Dr. Meyer's treatment notes from September 7, 2011—the same day she completed the residual functional capacity questionnaire—show that while Hopkins rated her knee pain as ten out of ten and complained that physical therapy was not helping, Dr. Meyer recommended continuing physical therapy and stretching, and made no mention of the significant limitations contained in the questionnaire.  (See pages 17-18 above.)  See, e.g., Martin v. Astrue, 337 F. App'x 87, 89 (2d Cir. 2009) ("[T]he ALJ's explanation for not according [the treating physician's] assessment controlling weight is supported by substantial evidence.  Notably, [the treating physician's] report of July 3, 2003—the same day as his medical source statement—notes only that plaintiff 'should not lift more than 30 [pounds], no prolonged standing, no pushing or pulling heavy objects,' and makes no mention of specific limitations on standing or walking.").

[25/]    See also, e.g., Perez v. Chater, 77 F.3d 41, 47-48 (2d Cir. 1996); Flanigan v. Colvin, 13 Civ. 4179, 2014 WL 1979927 at *16 (S.D.N.Y. May 15, 2014) (Peck, M.J.) ("Given the substantial evidence establishing that [the claimant's] condition had not become a medically determinable [disability, the ALJ] . . . was not required to contact [the treating physician] in order to satisfy the duty to develop the record."); Petell v. Comm'r of Soc. Sec., No. 12-CV-
(continued...)

Finally, and importantly, ALJ Hecht did not completely reject Dr. Meyer's opinion; rather, he expressly "acknowledges some limits resulting from [Hopkins'] knee problems." (R. 17.) Thus, ALJ Hecht credited Dr. Meyer's findings to the extent they were consistent with "the record as a whole," by rejecting assessor Beavan's conclusion that Hopkins was "capable of light work" (R. 17), and instead determining that Hopkins had the residual functional capacity only for sedentary work.[26/]  Accordingly, the Court finds ALJ Hecht's assessment that Hopkins is able to perform sedentary work was based on substantial evidence.

### b.      ALJ Hecht Properly Considered The Effects of Hopkins' Obesity

Hopkins argues that "while [ALJ Hecht] considered her obesity in evaluating whether she met a medical listing, there is no indication that he considered the effects of her obesity on her RFC, as required by Social Security Ruling 02-1p."  (Dkt. No. 13: Hopkins Br. at 14, citation omitted.)[27/]

---

[25/]     (...continued)
1596, 2014 WL 1123477 at *10 (N.D.N.Y. Mar. 21, 2014); Cordero v. Astrue, 11 Civ. 5020, 2013 WL 3879727 at *3 (S.D.N.Y. July 29, 2013); Hall v. Astrue, 677 F. Supp. 2d 617, 628 (W.D.N.Y. 2009).

[26/]     See, e.g., Penfield v. Colvin, 2014 WL 1673729 at *1 ("[S]ubstantial medical evidence from th[e] relevant period . . . generally indicated that although [the claimant] suffered from several musculoskeletal conditions, those conditions prevented her only from 'crawling,' 'walking stairs,' and repetitive activities involving 'bending,' 'lifting,' or 'twisting.'  As the ALJ correctly observed, none of these limitations 'preclude [the claimant's] engagement in at least sedentary exertion.'").

[27/]     Hopkins also argues that ALJ Hecht "mischaracterized the severity of plaintiff's obesity, stating that her Body Mass Index was 30, whereas it actually was over 38 – close to the morbid obesity level of 40."  (Hopkins Br. at 14, citation omitted.)  ALJ Hecht clearly stated that Hopkins' weight was "recorded as high as 260 pounds with a height of 69 inches," which "results in a body mass index above 30, thus obese."  (R. 14, emphasis added.)

An ALJ's final determination can constitute an appropriate consideration of the effects of obesity if it properly weighs evaluations by doctors that have accounted for the claimant's obesity.  See, e.g., Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) ("Because her doctors must also be viewed as aware of [the claimant's] obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition."); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("[T]he ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity.  Thus, although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."); Paulino v. Astrue, 08 Civ. 2813, 2010 WL 3001752 at *19 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (The ALJ "properly considered the effects of [the claimant's] obesity by adopting treating physicians' and consultative doctors' opinions, which specifically accounted for [the claimant's] obesity when determining her capacity for work."); Watson v. Astrue, 08 Civ. 1523, 2010 WL 1645060 at *5 (S.D.N.Y. Apr. 22, 2010) ("[B]ecause the ALJ adopted the physical limitations findings of [examining doctors], which necessarily incorporated an assessment of Plaintiff's asserted obesity, her failure to explicitly discuss obesity was not an error of law."); Rushford-Spink v. Astrue, No. 08-cv-827, 2010 WL 396359 at *12 (N.D.N.Y. Jan. 25, 2010) ("The record makes clear that Plaintiff is obese.  Although the ALJ did not expressly address Plaintiff's obesity, the ALJ considered the physical limitations set forth by the treating physicians taken in conjunction with that from the state agency consultant. . . .  Accordingly, the ALJ's failure to specifically address her obesity does not warrant a remand.").[28]

---

[28]    See also, e.g., Hulbert v. Comm'r of Soc. Sec., No. 06-CV-1099, 2009 WL 2823739 at *12 (N.D.N.Y. Aug. 31, 2009) ("The record makes clear that plaintiff is obese.  Although the ALJ did not expressly address plaintiff's obesity, he considered the physical limitations set
(continued...)

In determining Hopkins' residual functional capacity to perform sedentary work, ALJ Hecht relied on medical opinions that specifically accounted for Hopkins' obesity.  (R. 16-17.)  Dr. Johnston, whose opinion was assigned "significant weight" (R. 16), specifically diagnosed Hopkins with obesity when determining her "moderate" limitations bending, lifting carrying, stooping and kneeling.  (See page 11 above.)  State assessor Beavan, whose opinion was assigned "some weight" (R. 17), explicitly considered Hopkins' obesity as an impairment when determining her "occasional" postural limitations.  (See pages 11-12 above.)  Moreover, the medical record considered by ALJ Hecht contained seven years of medical records from MLKHC and Bronx-Lebanon, replete with general references to Hopkins' weight and BMI, specific references to obesity—including an August 17, 2010 "morbid obesity" diagnosis—and discussions of various recommended weigh loss treatment plans.  (See pages 4-10 above.)  Accordingly, ALJ Hecht properly considered the effects of Hopkins' obesity by adopting medical opinions that explicitly accounted for Hopkins' obesity when determining her capacity for work.

---

[28]/     (...continued)
forth by the treating physicians taken in conjunction with that from the state agency consultant. . . . [T]he ALJ's failure to specifically address her obesity does not warrant a remand.");  Martin v. Astrue, No. 05-CV-72, 2008 WL 4186339 at *3 (N.D.N.Y. Sept. 9, 2008) ("[A]lthough the ALJ did not explicitly address Plaintiff's obesity, the ALJ utilized the physical limitations set forth by the treating physicians taken in conjunction with that from the state agency consultant . . . . Therefore, . . . the ALJ's failure to specifically address [plaintiff's] obesity does not warrant a remand." (quotations omitted)), aff'd, 337 F. App'x 87 (2d Cir. 2009);  Cruz v. Barnhart, 04 Civ. 9011, 2006 WL 1228581 at *9 (S.D.N.Y. May 8, 2006) (Although "an ALJ must consider the effects of obesity when evaluating disability . . . there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases.");  Guadalupe v. Barnhart, 04 Civ. 7644, 2005 WL 2033380 at *6 (S.D.N.Y. Aug. 24, 2005) ("When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions. . . . The ALJ's decision sufficiently, if somewhat indirectly, accounted for Plaintiff's obesity and determined that it did not impose a functional limitation on light work.").

**D.      Hopkins had the Ability to Perform her Past (Sedentary) Work (or Other Sedentary Work)**

The fourth prong of the five part analysis asks whether Hopkins had the residual functional capacity to perform her past relevant work, that is, her work as a bank data processor. (See page 22 above.)  ALJ Hecht found that Hopkins had the residual functional capacity to perform sedentary work.  (R. 15-17.)  "Sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).  It is generally agreed by both the Commissioner and the Second Circuit that sedentary work involves sitting six hours out of an eight hour work day.  See, e.g., Penfield v. Colvin, No. 13-2225-cv, --- F. App'x ----, 2014 WL 1673729 at *1 n.1 (2d Cir. Apr. 29, 2014); Ferraris v. Heckler, 728 F.2d 582, 587 n.3 (2d Cir. 1984).[29]

Hopkins' past relevant work as a bank data processor qualifies as sedentary work. Hopkins' job as a bank data processor involved sitting and typing information into a computer database for about eight hours per day, no walking and no lifting of any kind. (See page 2 above.)

---

[29]      See also, e.g., DiPalma v. Colvin, 951 F. Supp. 2d 555, 577 n.21 (S.D.N.Y. 2013) (Peck, M.J.); Garner v. Astrue, 08 Civ. 6367, 2009 WL 903742 at *18 (S.D.N.Y. Apr. 6, 2009) (Peck, M.J.), report & rec. adopted, 2009 WL 1911744 (S.D.N.Y. June 30, 2009); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *24 (S.D.N.Y. July 2, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *12 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Casiano v. Apfel, 39 F. Supp. 2d 326, 329 n.2 (S.D.N.Y. 1999) (Stein, D.J. & Peck, M.J.), aff'd, No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.).

ALJ Hecht's conclusion was supported by the opinions of treating and consultative physicians.  On November 10, 2010, consultative physician Dr. Johnston found only moderate limitations on bending, lifting, carrying, stooping and kneeling.  (See page 11 above.)  On November 22, 2010, state assessor Beavan found that in eight-hour workday, Hopkins could stand or walk for six hours, sit for six hours and push or pull without limitation.  (See page 11 above.)  Although Dr. Meyer opined that Hopkins could sit for less than two hours total in an eight-hour workday (see page 13 above) and Hopkins testified she could sit for only five to ten minutes at a time (see page 3 above), ALJ Hecht properly discredited this evidence, as discussed above.  (See pages 40-45 above.)

Accordingly, substantial medical and functional capacity evidence supported ALJ Hecht's conclusion that Hopkins was capable of resuming her former employment as a bank data processor, a sedentary job.

Because Hopkins did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").[30/]

ALJ Hecht, however, proceeded to the fifth step, and the Court does as well.

---

[30/]   Accord, e.g., Garner v. Astrue, 2009 WL 903742 at *19; Gibbs v. Astrue, 2008 WL 2627714 at *25; Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Papp v. Comm'r of Soc. Sec., 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. Apr. 11, 1995)).

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[31/]

> In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567. Taking account of the

---

[31/]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

Using the Grid, a person of Hopkins' age (thirty-seven), education (bachelor's degree) and ability to perform sedentary work, is not disabled for purposes of Social Security benefits.  20 C.F.R., Pt. 404, Subpt. P, App. 2, § 201.28; see also 20 C.F.R. §§ 416.945-.969a.  Thus, ALJ Hecht's decision was supported by substantial evidence.

## III.    THE COURT SHOULD NOT REMAND THIS ACTION TO THE COMMISSIONER BECAUSE THE AMENDED ADMINISTRATIVE RECORD SUPPORTS THE COMMISSIONER'S DECISION

In support of her appeal, Hopkins submitted progress notes regarding her knee treatment, signed by Dr. Meyer and Dr. Durojaye at BronxCare Orthopedics and dated from March 8, 2011 through December 9, 2011.  (R. 348-73.)

When a claimant submits new and material evidence to the Appeals Council upon a request for review of the ALJ's decision and the Appeals Council denies review, the evidence becomes part of the record.  Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996); Nieves v. Colvin, 13 Civ. 0107, 2014 WL 1377582 at *17 (S.D.N.Y. Apr. 3, 2014) (Peck, M.J.); Jones v. Apfel, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999) (Pauley, D.J. & Peck, M.J.).  The Court then must review the amended administrative record to determine whether there is substantial evidence to support the Commissioner's decision.  Perez v. Chater, 77 F.3d at 46; Nieves v. Colvin, 2014 WL 1377582 at *17; Jones v. Apfel, 66 F. Supp. 2d at 536.

The Appeals Council considered Hopkins' newly submitted BronxCare Orthopedics treatment notes but "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (R. 2; see R. 4-5.)  Hopkins argues that the new records

submitted to the Appeals Council "provided further support for the opinion of treating orthopedist Meyer that the ALJ had discounted in his opinion." (Dkt. No. 13: Hopkins Br. at 15-16; Dkt. No. 22: Hopkins Reply Br. at 2-4.)  The Court disagrees.

   None of the information contained in these treatment notes affects the bases for ALJ Hecht's decision not to assign "much weight" to Dr. Meyer's residual functional capacity opinion. As the Commissioner points out, "notes from these visits show plaintiff had some complaints, but largely unremarkable examination results." (Dkt. No. 21: Gov't Br. at 24; <u>see</u> page 15 above.)  For example, Dr. Meyer's treatment notes dated March 8, 2011 show Hopkins rated her pain as a six out of ten, contradicting her testimony and Dr. Meyer's opinion that Hopkins' pain level was ten out of ten. (R. 351; <u>see</u> pages 16-17 above.)  Moreover, the documentation confirms that Dr. Meyer in fact only saw Hopkins twice, on March 8, 2011 and on September 7, 2011, the very date on which she completed the residual functional capacity questionnaire. (<u>See</u> pages 16-18 above.)  Contrary to Hopkins' argument, her additional "visit to another physician at the same facility" (Hopkins Reply Br. at 2; <u>see</u> pages 16-17 above), is not significant. <u>See</u>, <u>e.g.</u>, <u>Petrie</u> v. <u>Astrue</u>, 412 F. App'x 401, 407-08 (2d Cir. 2011) ("[T]he ALJ clearly considered the length of the treatment relationship and frequency of the examination in assigning minimal weight to [the treating physician's] opinion, since he noted that [the treating physician] had only four treatment notes bearing his signature, two of which appeared to be for examinations performed by another provider.  [The treating physician's] own opinion states that he treated [plaintiff] 'sporadically,' and the ALJ also observed that at the time [the treating physician] rendered his opinion, it had been a year since he had last seen [plaintiff] personally.  Similarly, the ALJ assigned minimal weight to [another treating physician's] opinion because it followed only one initial appointment with [plaintiff]. . . . In sum, the ALJ gave proper

consideration to all relevant factors pursuant to applicable regulations."); <u>see also</u> cases cited on pages 40-45 above.

Accordingly, Hopkins' newly proffered evidence submitted to the Appeals Council supports the ALJ's decision and does not require a remand.

## **CONCLUSION**

For the reasons set forth above, the Commissioner's motion (Dkt. No. 20) should be <u>GRANTED</u> and Hopkins' motion (Dkt. No. 12) should be <u>DENIED</u>.

## **FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, 500 Pearl Street, Room 2210, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Torres (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>Ingram</u> v. <u>Herrick</u>, 475 F. App'x 793, 793 (2d Cir. 2012); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d

54

Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy</u> v. <u>Manson</u>, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:        New York, New York
              June 5, 2014

                                        Respectfully submitted,

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies ECF to:        All Counsel
                      Judge Torres